# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CARL ROBERT ARMSTRONG, DONNA M.
BRADLEY, and JEAN K. ARMSTRONG,

          Plaintiffs,

v.

CITY OF MELVINDALE, CORPORAL DAN
CADEZ, DAVID FOBAR, BRAD GRATZ,
CHIEF JOHN F. DIFATTA, OFFICER FNU
KOPEK, OFFICER PATRICK EASTON,
JOHN DOES I-III, KAREN PLANTS, and
RICK CADEZ in their individual capacities and
Chief in his individual and official capacities,

          Defendants.

_____ /

Case Number:  02-CV-73492-DT

JUDGE PAUL D. BORMAN
UNITED STATES DISTRICT COURT


## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
## THE MELVINDALE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


      Now before the Court is a motion for summary judgment by the City of Melvindale ("the

City"), John F. Difatta ("Difatta"), Patrick Easton ("Easton"), Brad Kropik ("Kropik"), Dan

Cadez, and Rick Cadez (collectively "the Melvindale Defendants") on all of Plaintiff's claims

against them.  The Court heard oral argument on May 4, 2005.

      Having considered the entire record, and for the reasons that follow, the Court GRANTS

the instant summary-judgment motion as to all of Plaintiffs' claims against all of the Melvindale

Defendants except for Plaintiffs' § 1983 and conversion claims against certain individual

Melvindale Defendants for their alleged damage to, use of, and failure to return the seized

property, as set forth in Counts I and III, respectively.  As to these excluded claims, the Court

DENIES the instant motion for summary judgment.

## I.  BACKGROUND

On July 26, 2002, Carl Robert Armstrong ("Armstrong"), Armstrong's wife, Donna M.

Bradley ("Bradley"), and Armstrong's mother, Jean K. Armstrong ("Jean Armstrong"),

(collectively "Plaintiffs")[1] filed suit in Wayne County, Michigan, Circuit Court against the City;

Difatta, the chief of the City's police department; Dan Cadez, Kropik, and Easton, all officers

with the City's police department; David Fobar ("Fobar") and Brad Gratz ("Gratz"), officers

with the Southgate, Michigan, police department; and Karen Plants ("Plants"), a Wayne County,

Michigan, assistant prosecuting attorney (collectively "Defendants").  On August 30, 2002,

Defendants timely removed the action to this Court.  The case was assigned to U.S. District

Judge George E. Woods.

On June 24, 2003, Plaintiffs, with the leave of the Court, filed a First Amended

Complaint ("complaint"), which added Rick Cadez, an officer with the City's police department,

as a Defendant.  The complaint clarifies that Plaintiffs are suing all of the individual Defendants

solely in their individual capacities, with the exception of Difatta, whom Plaintiffs are suing in

both his official and individual capacity.  (1st Am. Compl. at ¶¶ 5-13.)  Count I alleges that, as

actionable via 42 U.S.C. § 1983, Defendants subjected Plaintiffs to unreasonable searches and

seizures in violation of the 4th Amendment; deprived Plaintiffs of their property without due

process of law in violation of the 5th and 14th Amendments; denied Plaintiffs equal protection of

---

[1]While Renae Armstrong, Lori Armstrong, Brandy Armstrong, and Carl R. Armstrong, Jr. were also plaintiffs in the action, the Court, pursuant to the parties' stipulation, issued an order, dated May 9, 2003, dismissing them with prejudice from the action.

the law in violation of the 14th Amendment; and retaliated against Plaintiffs in violation of the 1st Amendment.  (1st Am. Compl. at ¶¶ 64-66.)  Count II alleges that, as actionable via § 1983, Defendants conspired to violate Plaintiffs' constitutional rights.  (*Id.* at ¶¶ 67-68.)  Count III alleges claims of false arrest/imprisonment, malicious prosecution, conversion, and trespass under Michigan law. (*Id.* at 69-72.)  Count IV alleges parallel violations of Plaintiffs' rights under the Michigan Constitution.  Count V alleges that Defendants conspired to violate Plaintiffs' constitutional rights in violation of common law.

On February 20, 2004, Plants filed a motion for summary judgment on all of Plaintiffs' claims against her.  On July 16, 2004, the Court, per the Honorable George E. Woods, granted Plants' motion for summary judgment in its entirety.  Specifically, the Court held that Plants was entitled to absolute immunity on Plaintiffs' § 1983 claims against her, Counts I and II, and that Plaintiffs did not oppose summary judgment in Plants' favor on Plaintiffs' remaining state-law claims against her, Counts III through V.  (July 16, 2004, Opinion at 9, 14.)  Thus, none of Plaintiffs' claims remain against Plants.

Earlier on February 20, 2004, Fobar and Gratz (collectively "the Southgate Defendants") filed a motion for summary judgment on all of Plaintiffs' claims against them.  On August 12, 2004, the Court, per Judge Woods, granted in part and denied in part the Southgate Defendants' motion for summary judgment.  In particular, the Court found that Plaintiffs did not oppose summary judgment in the Southgate Defendants' favor on Plaintiffs' § 1983 claims based upon due process, equal protection, and the 1st Amendment, as set forth in Count I, or on Plaintiffs' state-law claims of malicious prosecution, conversion, and trespass, as set forth in Count III. (August 12, 2004, Opinion at 7.)  As to Plaintiffs' § 1983 and common-law claims of unlawful

conspiracy, Counts II and V, the Court found that Plaintiffs failed, as a matter of law, to demonstrate that the Southgate Defendants engaged in a conspiracy to violate Plaintiffs' constitutional rights. (*Id.* at 13.)  Concerning Plaintiffs' § 1983 claim based upon the Fourth Amendment, as set forth in Count I, the Court found that genuine issues remained about whether the Southgate Defendants' actions violated the Fourth Amendment, and that they were not, as a matter of law, entitled to qualified immunity. (*Id.* at 16, 18.)  As to Plaintiffs' state-law claims of false arrest/imprisonment, as set forth in Count III, the Court held that Michigan's two-year statute of limitations, M.C.L. 600.5895(2), barred those claims. (*Id.* at 19.)  Thus, only Plaintiffs' § 1983 claim arising under the 4th Amendment, as set forth in Count I, remains against the Southgate Defendants.  Plaintiffs, at oral argument, represented that the Court's August 12, 2004, opinion as to the Southgate Defendants is currently on appeal to the United States Court of Appeals for the Sixth Circuit as to the issue of qualified immunity.

On March 15, 2005, the Melvindale Defendants filed the instant motion for summary judgment on all of Plaintiffs' claims against them.

## II.  FACTS

In July of 1999, Armstrong was preparing to operate a business called Computer Time at 4227 Oakwood in Melvindale, Michigan ("the premises").[2]  (Armstrong Dep. at 7-8; Defs.' Br. at 2; Resp. at 1.)  Jean Armstrong purchased the premises in 1993.  (Armstrong Dep. at 7-8; Jean

---

[2]In his deposition, Armstrong testified that he had an existing client base, and, specifically, had about fifteen or twenty on-going design or electronic projects from as many different customers. (Armstrong Dep. at 36-46.)  While the building had a "Computer Time" sign on its front, (Pls.' Resp. at 1; Ex. 26.), Armstrong testified that he was unable to open Computer Time due to the Melvindale Defendants' seizure of his computers and equipment from the premises, (Pls.' Resp. at 4; Armstrong Dep. at 36.).

4

Armstrong Dep. at 5.)  Jean Armstrong was to transfer the title to the premises to Armstrong in the near future.  (Armstrong Dep. at 8-9.)  "[A] high-tech retail/demonstration/workspace" was located on the building's main floor while Armstrong and Bradley's residence was located on the building's upper floor.  (Pls.' Resp. at 1.)

### A.  Search & Seizure at Premises

On July 26, 1999, the Southgate Defendants executed a Wayne County Circuit Court Order to inventory and seize the assets of CadVisions, a business in Southgate, Michigan, which purportedly had a history of narcotics activity and drug busts, pursuant to a pending forfeiture action.  (Defs.' Br. at 2; Pls.' Ex. 13.)  John Ziriada ("Ziriada") owned Cadvisions.  (Armstrong Dep. at 16-17.)  Since 1986, Armstrong built computers for Ziriada, his friend for approximately thirty to thirty-five years.  (*Id.*)

While the Southgate Defendants were executing the search warrant at CadVisions, Armstrong entered the building, presented his business card, and informed the officers that he owned all of the computers at CadVisions.  (Fobar Dep. at 23; Gratz Dep. at 7.)  Armstrong also informed the officers that he had documentation to prove that he owned the computers.  (Gratz Dep. at 7-8; Armstrong Dep. at 69.)  Armstrong, however, did not own the computers at CadVisions, and falsely asserted otherwise out of fear that, if the officers seized the computers, Ziriada would not pay him for his work.  (Armstrong Dep. at 69-70.)

The Southgate Defendants contacted Plants to obtain a search warrant for records, at Computer Time, corroborating Armstrong's ownership of the computers seized from CadVisions.  The Southgate Defendants inquired into the legality of such a warrant.  (Fobar Dep. at 23-25; Plants Dep. at 27.)  Plants concluded that it would be legal to issue a third-party search

5

warrant–here, a search warrant concerning Armstrong–in support of the Ziriada seizure.  (Plants Dep. at 27-29.)  Fobar prepared the warrant.[3]  (Fobar Dep. at 71-73.)  On July 28, 1999, Southgate District Court Judge James A. Kandrevas ("Judge Kandrevas") signed the search warrant, authorizing a search of Computer Time for documents demonstrating the ownership of the computers located at CadVisions ("the Southgate warrant").[4]  (Fobar Dep. at 19; Pls.' Ex. 13.)

On that same day, July 28, 1999, the Southgate Defendants executed the Southgate warrant at Computer Time in Melvindale.  (Fobar Dep. at 28-29.)  While inside the premises, the Southgate Defendants observed, in plain view, marijuana in an ash tray.  (Fobar Dep. at 36; Gratz Dep. at 11; Armstrong Dep. at 88.)  Fobar detected the odor of marijuana on the premises.  (Fobar Dep. at 34-35.)  When Fobar commented about the odor, Armstrong informed Fobar that there was a tin can of marijuana in a filing cabinet.  (*Id.* at 33-35; Armstrong Dep. at 88-89.)  Upon producing the can, which contained marijuana, joints, seeds, stems, and roach clips, Armstrong informed Fobar that the marijuana was for Armstrong's personal use and from some of his customers.  (Armstrong Dep. at 88-89; Dan Cadez Dep. at 17.)  At that point, Fobar

---

[3]After finding over one pound of marijuana, baggies, a scale, and drug paraphernalia at CadVisions, Fobar, in his supporting affidavit, averred that, based upon Armstrong's professed ownership of the computers at CadVisions, there was probable cause to believe that a review of all records in CadVision's or Ziriada's name at Computer Time would "show links between suspects and businesses for the purpose of concealing and/or legitimizing their drug proceeds."  (Pls.' Ex. 13.)

[4]The warrant also authorized the Southgate police to seize all suspected controlled substances, including marijuana, and all related items.  (Pls.' Ex. 13; Pls.' Resp. at 9.)  Yet, according to Fobar, Gratz, and Plants, the sole purpose of the search warrant was to obtain documentation regarding the ownership of the computers at CadVisions.  (Fobar. Dep; Plants Dep.; forfeiture transcript at 8-9; Pls.' Ex. 40.)

advised an unnamed Melvindale police officer, standing outside to provide security, of the marijuana found at Computer Time, and requested that he contact the Melvindale Police Department's Detective Bureau. (Fobar Dep. at 35; Resp. at 12.) Kropik subsequently arrived at the scene. (*Id.*)

Significantly, for this discussion of the Melvindale Defendants' involvement in the instant case, Kropik's arrival at the scene begins the Melvindale actions in the instant case. Kropik informed his department of Fobar's information, and the Melvindale Police Department response began. The Melvindale police sent Officer Dan Cadez to the scene. Upon arriving at Computer Time, Melvindale police officer, Dan Cadez, conducted a field test on the tin can's contents, verified marijuana, returned to the police station, and prepared a warrant to search the location for additional contraband on the premises. (Dan Cadez Dep. at 17-18, Aff. at ¶ 4.) In his supporting affidavit, Dan Cadez averred that he was notified that the Southgate police, in "executing a search warrant for records . . . as part of an ongoing investigation in which they have seized large quantities of illegal narcotics"–i.e. the Ziriada investigation, discovered marijuana and other items indicating drug trafficking, such as a scale. (Pls.' Ex. 23.) Dan Cadez further averred that, based upon his experience, there is probable cause to believe that additional contraband will be found at the premises. (*Id.*) Plants took the warrant application to a Wayne County district court judge, who signed the search warrant ("the Melvindale warrant"). (*Id.*)

The Court concludes that Melvindale officers were merely at the scene to provide protection, and that a Melvindale officer conducted a field test confirming marijuana based upon the Southgate officers' information. Melvindale's corroboration of the marijuana on the premises, and information from Southgate officers, gave them probable cause to procure a search

7

warrant for the Melvindale premises.  Specifically, the Court finds that, regardless of whether the Southgate officers had probable cause to secure the Southgate search warrant for the premises, there is no possible taint or fruit of the poisonous tree as to the Melvindale Police Department/Melvindale officers because they were not part of the search team with the Southgate officers; Melvindale officers merely stood outside during the Southgate search.

Thereafter, Dan Cadez, Kropik, and other Melvindale officers executed the Melvindale search warrant.  (Dan Cadez at 16-18; Kropik Aff. at ¶ 3.)  Upon opening a locked closet, the officers discovered a box containing approximately fifty pounds of marijuana.[5]  (*Id.*; Dan Cadez Aff. at ¶ 5.)  The officers also found a room believed to be a "cutting/packaging" room, which contained marijuana, scales, baggies, and packaging equipment.[6]  (Dan Cadez Dep. at 22-23, Aff. at ¶6.)  The officers never found any records demonstrating Armstrong's ownership of the computers at CadVisions, as Armstrong had maintained.[7] (Defs.' Br. at 4.)

Based upon these findings, Dan Cadez contacted Chief Difatta regarding the forfeiture of assets at the premises.  (Dan Cadez Dep. at 22-24; Dan Cadez Aff. at ¶ 7.)  Difatta, upon arriving at the scene, and Dan Cadez, directed the seizure of assets.  (Armstrong Dep. at 100-01, 109; Difatta Aff. at ¶¶ 4-5; Defs.' Br. at 12.)  As assets were seized, officers prepared an itemized inventory of them, giving Armstrong a copy of that inventory.  (Defs.' Ex. 4; Pls.' Ex. 35; Resp. at 14; Dan Cadez Aff. at 10.)  According to Plaintiffs, the Melvindale police seized almost all of

---

[5]Armstrong disclaims ownership of the marijuana, and contends that officers planted it. (Armstrong Dep. at 104-05.)

[6]Armstrong maintains that the room is simply a "furnace room" used to store "old electronic equipment."  (Armstrong Dep. at 84-85.)

[7]Indeed, according to the Melvindale Defendants, Armstrong produced a bill of sale indicating that the computers had been sold to CadVisions. (Defs.' Br. at 4.)

the contents of Computer Time, and of Armstrong and Bradley's private residence.

Armstrong was detained for over twelve hours while the search was conducted. (Armstrong Dep.1 at 101.) Following the search, Armstrong was transported to jail, where he was held for several hours. (Armstrong Dep. at 134.) Armstrong was never charged with a crime. (Dan Cadez Aff. at ¶ 9.)

Thereafter, Dan Cadez sought a search warrant for bank accounts and safety deposit boxes of Armstrong and/or Bradley, held individually or jointly with other persons. (Pls.' Resp. at 14.) In his affidavit, Dan Cadez averred that, based upon finding $1,400 in cash, fifty pounds of marijuana, packaging material, and a scale, there was probable cause to believe that a review of Plaintiffs' bank statements and institutional records would show that Plaintiffs were laundering drug-trafficking proceeds. (Pls.' Ex. 4.) On July 29, 1999, after reviewing the search warrant and its supporting affidavit, Plants went to a Wayne County district judge, who signed the search warrant. (*Id.*) According to Plaintiffs, several of the searched bank accounts belonged solely to Bradley and/or belonged to Bradley jointly with her daughter and two granddaughters. (*Id.*)

On August 16, 1999, Armstrong and Bradley filed suit in Wayne County Circuit Court against the City of Melvindale, the City of Southgate, and the Wayne County Prosecutor, seeking the return of the seized property under M.C.L. 333.7523(2). (Pls.' Resp. Ex. 45) On August 27, 1999, Plants, on behalf of the State of Michigan, filed, in Wayne County Circuit Court, a claim of forfeiture against Plaintiffs under M.C.L. 333.7521. (Pls.' Resp. at 3; Ex. 24.)

On February 18, 2000, the Wayne County Circuit Court, per Judge Michael Sapala, on a

9

motion for rehearing,[8] granted Bradley and Armstrong's motion to suppress on the ground that Armstrong's professed ownership of the computers at CadVisions was insufficient to create "probable cause to believe that there were any of the sought-after objects" at Computer Time. (See Ex. 11 to Fobar and Gratz's motion at 4.). On May 9, 2000, Judge Sapala issued an order, pursuant to the parties' stipulation, dismissing the forfeiture action with prejudice and directing the return of all seized items to Plaintiffs. (Pls.' Ex. 5.) On May 17, 2000, the state court, per Judge Robert Ziolkowski, issued an order, pursuant to the parties' stipulation, dismissing Armstrong and Bradley's complaint for the return of the seized property. (Pls.' Ex. 25.)

Armstrong, his attorney, Dan Cadez, and Kropik assisted in the return of the seized property. (Defs.' Ex. 6; Dan Cadez Aff. at ¶¶ 12-13; Reply at 4.) Armstrong checked each item as it was returned, but never claimed, at that time, that any item was damaged or missing. (Defs.' Ex. 6; Defs.' Br. at 5; Dan Cadez Aff. at ¶ 14.) According to Armstrong and Bradley now, however, certain of the seized property was never returned, returned damaged, or was used while in the Melvindale police's possession. (Pls.' Ex. 11.)

Rick Cadez and Easton played no role in the search and seizure of the premises. (Rick Cadez Aff. at ¶ 3; Easton Aff. at ¶ 3; Defs.' Br. at 10.)

**B. Seizure of Trailer**

In September of 1999, Rick Cadez, whose duty is to prevent the accumulation of abandoned vehicles on public property in the City of Melvindale, observed an unlicensed and

---

[8]On December 14, 1999, the state court denied Armstrong and Bradley's motion to suppress, ruling that, based upon Fobar's affidavit supporting the Southgate warrant, the magistrate judge could have reasonably concluded that there was a nexus between CadVisions and Computer Time regarding the laundering of drug-trafficking proceeds, and that the items to be seized at Computer Time could reveal evidence of criminal activity. (Ex. 10 to Fobar and Gratz's motion, at 17-18.)

unregistered trailer in what he believed to be a parking lot open to the public.  (Rick Cadez Aff.

at ¶ 5.)  Easton, at Rick Cadez's directive, impounded the trailer on September 26, 1999, without

notice to Armstrong.[9]  (Resp. at 3; Defs.' Br. at 4; Rick Cadez Aff. at ¶ 6; Easton Aff. at ¶ 5;

Kropik Aff. at ¶ 6.)  Pursuant to the Melvindale Police Department's policy, Easton, at Rick

Cadez' behest, ran the trailer's serial number through the LEIN records of each state to

determine its ownership.  (Defs.' Br. at 4-5; Rick Cadez Aff. at ¶ 8; Kropik Aff. at ¶ 6.)  Because

the trailer was neither registered nor licensed, the LEIN search did not disclose its ownership.

(Rick Cadez Aff. at ¶ 8; Kropik Aff. at ¶¶ 7- 8.)  Armstrong's phone number was spray-painted

on the trailer's side.  (Pls.' Ex. 26.)  The trailer was impounded because it was unlicensed and

unregistered and it appeared to be abandoned on public property.  (Rick Cadez Aff. at ¶ 7;

Easton Aff. at ¶¶ 4-5; Kropik Aff. at ¶ 4.)

        About three days after the trailer's impoundment, Armstrong filed a report with a

different Melvindale police officer, claiming that the trailer had been stolen.  (Pls.' Ex. 8.)

Although Armstrong provided a general description of his trailer, he could not provide any

license or serial number by which to identify the trailer.  (Defs.' Br. at 5; Defs.' Ex. 5.)  At the

behest of his then-counsel, Armstrong photographed the trailer in the impound lot, but never

advised the Melvindale police that the trailer that he had reported stolen was sitting in that lot.

(Defs.' Br. at 5; Defs.' Ex. 5; 1st Am. Compl. at ¶ 57; Pls.' Ex. 27.)

        After publishing notice of the sale of the trailer in a local newspaper and after no one

came forward claiming ownership of the trailer, Kropik, pursuant to the City's Abandoned

---

        [9]The trailer contained Armstrong's patented parking-lot striper machine as well as supplies
and parts for that machine.  (Pls.' Ex. 27.)

Vehicle Ordinance, sold the trailer at an auction in December of 1999.  (Kropik Aff. at ¶¶ 9-11; Defs.' Br. at 13.)

Dan Cadez and Difatta played no role in the impoundment and/or auction of the trailer. (Dan Cadez Aff. at ¶ 11; Difatta Aff. at ¶ 6; Defs.' Br. at 10.)

## III.  ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "material" fact is one "that might affect the outcome of the suit under the governing law[.]"  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A "genuine" issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  In deciding a motion for summary judgment, the Court must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 586.

As a threshold matter, Plaintiffs, at oral argument, conceded that the Melvindale Defendants are entitled to summary judgment on Plaintiffs' claims of: 1) an unlawful conspiracy, Counts II and V in their entirety; 2) violations of the Michigan Constitution, Count IV in its entirety; and 3) false arrest/imprisonment, malicious prosecution, and trespass under Michigan law, as set forth in Count III.  The Court, therefore, grants, as unopposed, the Melvindale

Defendants' motion for summary judgment as to these claims.  Remaining for purposes of the instant summary-judgment motion are all of Plaintiffs' § 1983 claims that are not related to the alleged unlawful conspiracy, as set forth in Count I, and Plaintiffs' claim of unlawful conversion under Michigan law, as set forth in Count III.

### A.  Section § 1983 Claims

As noted above, Count I alleges that, as actionable via 42 U.S.C. § 1983, the Melvindale Defendants subjected Plaintiffs to unreasonable searches and seizures in violation of the 4th Amendment; deprived Plaintiffs of their property without due process of law in violation of the 5th and 14th Amendments; denied Plaintiffs equal protection of the law in violation of the 14th Amendment; and retaliated against Plaintiffs in violation of the 1st Amendment.  (1st Am. Compl. at ¶¶ 64-66.)

### 1.  Claims Against the City

To state a claim against a municipality under § 1983 for monetary, declaratory, or injunctive relief, a plaintiff must show: 1) a deprivation of his constitutional or federal rights; 2) that occurred pursuant to a custom, usage, or official policy of the municipality.  *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978).  Regarding this latter requirement, § 1983 liability attaches to a municipality only when the execution of its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," inflicts the injury upon the plaintiff.  *Id.* at 694; *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 389 (1989) (affirming that a municipality may be "liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue" in that its policies or customs are the "moving force [behind] the constitutional violation")

13

(internal quotation marks omitted).  The policy or custom must originate from the "official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati,* 475 U.S. 469, 483 (1986) (reiterating that a municipality is liable only for its own acts–acts that it "has officially sanctioned or ordered").  However, a "policy" is simply "a deliberate choice to follow a course of action . . . from among various alternatives" and, thus, under appropriate circumstances, municipal liability may lie "for a single decision by municipal policymakers."  *Id.*  Section 1983 liability does not lie against a municipality solely because it employed a tortfeasor or based upon a theory of *respondeat superior* or vicarious liability.  *Monell,* 436 U.S. at 691.

The City contends that summary judgment is appropriate on Plaintiffs' § 1983 claims against it because Plaintiffs are improperly attempting to impose vicarious liability on the City. (Defs.' Br. at 8.)  According to the City, Plaintiffs have presented no evidence that a policy or custom of the City was the moving force behind the alleged violations of their rights. (*Id.*)

Plaintiffs, in response, allege municipal policies or customs relating only to the impoundment and auction of Armstrong's trailer and its contents.  (Resp. at 23.)  Specifically, Plaintiffs contend that the City's policies of only checking states' LEIN records to determine an impounded vehicle's ownership and of only giving notice of the vehicle's sale via publication in a local newspaper are unconstitutional where the City could easily ascertain a vehicle's ownership or give notice of the vehicle's sale by taking other steps, such as calling a telephone number painted on the vehicle's side or inquiring at nearby buildings.  (*Id.*)  However, because such challenged actions, as a matter of law, did not violate Plaintiffs' constitutional rights in the first instance, as discussed below, any § 1983 claims against the City based upon those actions

14

must fail as a matter of law.  The Court, therefore, grants the Melvindale Defendants' motion for summary judgment on all of Plaintiffs' § 1983 claims against the City.

### 2.  Claims Against the Individual Defendants

To state a claim under 42 U.S.C. § 1983 against a defendant in his individual capacity, the plaintiff must show that: 1) the defendant; 2) acted under color of state law; and 3) deprived him of a federal right.  *Sperle v. Mich. Dep't of Corrections,* 297 F.3d 483, 490 (6th Cir. 2002).

The doctrine of qualified immunity affords "not a defense to liability," but, rather, "an immunity from suit altogether . . . to avoid [the] burdens of [the] costs of trial."  *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985).  Under the qualified-immunity doctrine, government officials performing discretionary functions are not liable for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  In determining whether a government official is entitled to qualified immunity, a court must first determine whether the facts alleged, when viewed in the light most favorable to the party asserting the injury, show that the public official's conduct violated a constitutional right, and, if so, whether that right was so clearly established that a reasonable official would understand that his particular conduct would violate that right.  *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).  A government official is entitled to qualified immunity where he "acted under the objectively reasonable belief that his or her actions were lawful."  *Ahlers v. Schebil,* 188 F.3d 365, 373 (6th Cir. 1999) (citing *Harlow,* 457 U.S. at 815-19.)

The individual Melvindale Defendants contend that they are entitled to summary judgment on Plaintiffs' remaining § 1983 claims against them.  The individual Melvindale

Defendants further contend that, as a matter of law,  they are entitled to qualified immunity on those claims.  The Court will address their entitlement to qualified immunity in the context of each claim.

### a.  Search of Premises & Seizure of Person

Plaintiffs claim that the individual Melvindale Defendants, in searching the premises pursuant to the Melvindale warrant, violated Plaintiffs' 4th Amendment rights to be free from unreasonable searches.  The probable cause supporting the Melvindale warrant to search for additional contraband arose from the marijuana that the Southgate Defendants observed while executing the Southgate warrant at the Melvindale address.  (Resp. at 19; Defs.' Br. at 12.)  The parties dispute whether the Melvindale Defendants are entitled to qualified immunity for their search of the premises.  A defendant is not entitled to qualified immunity where a "reasonably well-trained officer [in the defendant's position] would have known that the search [or seizure] was illegal despite the magistrate's authorization" or that "his affidavit failed to establish probable cause and that he should not have applied for the warrant."  *Malley v. Briggs*, 475 U.S. 335, 345 (1986).

According to Plaintiffs, the Southgate warrant lacked probable cause on its face.  (Resp. at 19.)  Specifically, Plaintiffs contend that the Southgate search warrant was "excessive, unnecessary, invalid, and pretextual" in that its aim was to gather evidence criminally inculpating Armstrong without probable cause to believe that any such crimes existed.[10] (1st Am.

---

[10]Plaintiffs underscore that the documentation regarding the ownership of the computers at CadVisions could have been obtained via subpoena; that Armstrong was not suspected of any criminal activity at the time that the Southgate warrant was obtained; and that the Southgate warrant was executed by officers wearing flack vests, body armor, and face shields and with at least one gun drawn. (Armstrong Dep. at 78; Resp. at 11.)

16

Compl. at ¶ 25.)  Plaintiffs further maintain that, as a reasonably well-trained officer, Dan Cadez should have known that the Southgate warrant lacked probable cause and, thus, that any evidence or search warrant based solely from the fruits of the Southgate warrant would also lack probable cause. (Resp. at 20.)  This is not a correct statement of the law given the instant factual scenario.  The Melvindale search warrant is examined on its own with regard to Plaintiffs' claims against the Melvindale Defendants; there is no evidence supporting a claim that, at the time of the Southgate search, the parties were engaged in a joint operation.

The Melvindale Defendants also assert that, even if the individual Melvindale Defendants' conduct violated Plaintiffs' constitutional rights in obtaining and executing the Melvindale search warrant, they acted under the objectively-reasonable belief that their conduct was lawful.  (Reply at 6.)  In support, the Melvindale Defendants underscore that the state court, only after reconsideration and much deliberation, invalidated the Melvindale warrant months after it was executed solely based upon its invalidation of the Southgate warrant from which it derived. (Defs.' Br. at 12; Reply at 6-7.)  According to the Melvindale Defendants, neither the Southgate nor the Melvindale warrants were facially invalid so as to indicate to a reasonable police officer that their actions were unlawful. (Reply at 7.)

In his supporting affidavit, Dan Cadez averred that he was notified that the Southgate police, in "executing a search warrant for records . . . as part of an ongoing investigation in which they have seized large quantities of illegal narcotics," discovered marijuana and other items indicating drug trafficking, such as a scale.  (Pls.' Ex. 23.)  Dan Cadez further averred that, based upon his experience, there is probable cause to believe that additional contraband will be found at the premises.  (*Id.*)

17

Based upon the marijuana and drug-trafficking evidence found at the premises, a reasonably well-trained officer in Dan Cadez' position would not have known that his affidavit failed to establish probable cause to obtain the Melvindale warrant. Indeed, as the Court concludes, there was probable cause contained in Dan Cadez's affidavit to support the issuance of the Melvindale search warrant. This Court evaluates the sufficiency of the affidavit under federal standards, and is not required to accept state-court determinations of these federal standards in this federal § 1983 lawsuit. The individual Melvindale Defendants are, therefore, entitled to qualified immunity on Plaintiffs' § 1983 claims concerning the search of the premises pursuant to the Melvindale warrant.

Plaintiffs claim that the individual Melvindale Defendants, in detaining Armstrong during and following the execution of the Melvindale warrant, violated Armstrong's 4th Amendment right to be free from unreasonable seizures. Specifically, Plaintiffs argue that, because the individual Melvindale Defendants knew or should have known that the Melvindale warrant was invalid, they knew or should have known that Armstrong's detention was invalid. (Resp. at 20.) However, even if Armstrong's detention were unconstitutional, since reasonably well-trained officers in the Melvindale Defendants' position would not have known that the Melvindale warrant was invalid, such officers would also not have known that Armstrong's detention pursuant to that warrant was invalid. The Court notes that the Melvindale officers found 50 pounds of marijuana and a drug-packaging lab in the search of the premises, containing his store and his house. Thus, the individual Melvindale Defendants are entitled to qualified immunity on Plaintiffs' § 1983 claims concerning Armstrong's detention pursuant to the Melvindale warrant.

18

**b. Seizure of Assets at Premises**

The Melvindale warrant authorized the Melvindale Defendants to seize marijuana and any items obtained through the sale of controlled substances, including the proceeds from the sale of those substances.  (Pls.' Ex. 23.)  According to Plaintiffs, there was no probable cause to believe that any of the assets seized from the premises represented the proceeds of drug trafficking or were used to facilitate any such trafficking. (1st Am. Compl. at ¶¶ 34, 46.)

According to Armstrong, he had fifteen to twenty years of experience working in the computer field, an existing client base, and about fifteen or twenty on-going design or electronic projects for as many different customers. (Armstrong Dep. at 36-46; Resp. at 1.)  Plaintiffs assert that the Melvindale Defendants seized assets and bank accounts belonging solely to Bradley, including her 1993 Jeep Cherokee, Precious Moments collection, two television sets, an antique pepper mill, and her bank accounts deriving solely from her employment. (1st Am. Compl. at ¶ 38; Resp. at 2, 14; Pls.' Ex. 4.)

Plaintiffs further claim that most of the items seized were "old worthless junk" that clearly had no connection to drug trafficking.  (Resp. at 14.)  Plaintiffs underscore that the Melvindale Defendants seized "computers, software, computer parts, a vacuum cleaner, a microwave oven, a drill, a saw, a floor jack, a welder, [and] a generator."  (*Id.* at 17; Pls.' Ex. 11.)  According to Plaintiffs, the Melvindale search uncovered no "drug tally records," "baggies," "evidence of lavish lifestyle," or "lack of any legitimate means of support," and the property seized was "vastly assorted and mundane" rather than luxury items. (Resp. at 18.)  Plaintiffs argue that a "one-time discovery of drugs and a scale, without any other evidence," is insufficient to constitute probable cause to believe that all of the property seized was traceable to

19

drug-trafficking proceeds. (*Id.*) Plaintiffs concede, however, that such evidence may have given rise to probable cause to seize the entire premises on the theory that the premises were "used to contain or [to] facilitate drug transactions by serving as a storage site and even arguably a processing site." (*Id.*) In addition, the Melvindale Defendants were aware of the fact that Plaintiff had appeared at the Southgate premises of an individual with a reputation of involvement in narcotics, and that Plaintiff told the Southgate officers that all of the computers used by that Southgate individual were Plaintiff's. Thereafter, Plaintiff changed course and said that this was a lie. Plaintiff's conduct certainly supports a reasonable belief that Plaintiff was involved in providing computer assistance in the laundering of drug proceeds.

According to Plaintiffs, reasonable officers would have known that there was no probable cause to seize Plaintiffs' property for forfeiture such that the Melvindale Defendants are not entitled to qualified immunity. (Resp. at 18.) The Melvindale Defendants, in turn, contend that their seizure of Plaintiffs' property for forfeiture was reasonable based upon finding, at the premises, the enormous quantity of marijuana–fifty pounds–and the room seemingly used to package the marijuana for further distribution. (Defs.' Br. at 12.) The Melvindale Defendants further underscore that, because of what they found at the premises and because both Armstrong and Bradley lived there, the officers' decision to seize all of the property at the premises, including that which belonged to Bradley rather than Armstrong, was also reasonable.

Even if the Melvindale Defendants' seizure of Plaintiff's property for forfeiture were somehow unconstitutional, reasonable officers in their position would have believed that they possessed the requisite probable cause to believe, based upon the evidence, at the premises, of trafficking in over 50 pounds of marijuana, that all of Plaintiffs' property at the premises derived

20

from the proceeds of such major drug-trafficking.  Thus, the individual Melvindale Defendants

are entitled to qualified immunity on Plaintiffs' § 1983 claims regarding the seizure of their

property pursuant to the Melvindale warrant.  Moreover, to the extent that Plaintiffs contend that,

because the individual Melvindale Defendants knew or should have know that the Melvindale

warrant was invalid, they knew or should have known that their seizure of Plaintiffs' property

pursuant to that warrant was invalid, such a claim, as discussed above, would necessarily fail.

### c.  Alleged Damage to, Failure to Return, and Use of Certain Seized Property

Plaintiffs assert that the individual Melvindale Defendants' conversion and use of the

seized property constitutes an unreasonable seizure, a taking without just compensation, or the

deprivation of property without due process of law.  (Pls.' Br. at 19.)

Plaintiffs claim that, during the seizure following the execution of the Melvindale

warrant, the Melvindale Defendants damaged a satellite dish, security cameras, and internal

wiring, and broke a window of Bradley's car.  (Resp. at 19.)   Plaintiffs further claim that some of

the seized property was never returned to them.  (*Id.* at 4, 15; Pls.' Ex. 11)  Plaintiffs assert that,

following the return of some of their seized property, they discovered that the Melvindale

Defendants had used Armstrong's fax machine and computer while they had been in their

possession.  (Pls.' Br. at 15-16; Pls.' Exs. 16-17.)  Specifically, Armstrong's fax machine was

reprogrammed to indicate the Melvindale Police Department as the sender.  (Pls.' Ex. 16.)

Moreover, during the time that the Melvindale police had custody of Armstrong's computer,

files had been deleted from and downloaded onto it, and pornographic and police-related

websites along with Armstrong's internet account had been accessed from it.  (Armstrong Dep.

at 38, 119-20; Resp. at 15; Pls.' Ex. 17.)  Kropik testified to the Melvindale police having used

Armstong's equipment for departmental purposes. (Pls.' Ex. 20; Resp. at 16.)

The Melvindale Defendants simply underscore that, pursuant to the state-court order, they returned to Plaintiffs all of the items that they had seized. (Defs.' Br. at 15.) According to the Melvindale Defendants, Plaintiffs' counsel, in the presence of Plaintiffs, Dan Cadez, and Kropik, initialed every item on the list of seized goods as having been returned, and Plaintiffs, up until the filing of the instant lawsuit, never complained that any of the seized items were damaged or had not been returned. (Defs.' Br. at 15; Reply at 4.) Yet, Plaintiffs assert that much of the seized property was never listed on any return (1st Am. Compl. at ¶ 48.)

When viewing the evidence in Plaintiffs' favor at this stage, genuine issues of material fact exist as to whether the individual Melvindale Defendants damaged, failed to return, or used Plaintiffs' seized property in violation of Plaintiffs' constitutional rights. Moreover, reasonable officers in the Melvindale Defendants' position would have known that such alleged conduct was unlawful. Thus, the individual Melvindale Defendants are not entitled to summary judgment on Plaintiffs' § 1983 claims concerning the conversion of their seized property.

### d. Seizure and Sale of Trailer and its Contents

Plaintiffs contend that the seizure and sale of Armstrong's trailer without notice violated his 4th Amendment right to be free from unreasonable seizures and his 14th Amendment right to the due process of law. According to the Melvindale Defendants, they impounded the trailer pursuant to Melvindale Ordinance, Article I, Section 21-2(b), which provides:

> A motor vehicle improperly registered or plated standing or parked upon a public street or highway or area open to the public shall be subject to immediate towing to the police automobile pound, unless prior to towing an owner can produce a valid registration.

(Ex. 22.). The Melvindale Defendants argue that the trailer was situated in a parking lot

22

adjacent to the premises, and that the premises were open to the public. (Defs.' Br. at 13.) The Melvindale Defendants underscore that the trailer was neither licensed nor registered. (*Id.*) According to them, the trailer was treated as abandoned when, upon running the trailer's serial number through the LEIN system, the system did not indicate the owner of the trailer. (*Id.*)

While Plaintiffs concede that the trailer was neither licensed nor registered, they assert that the parking lot was private rather than "open to the public" because Armstrong had yet to open Computer Time, and, thus, that only Armstrong and Bradley's private residence were on the premises. (Resp. at 21.) Plaintiffs argue that, therefore, the local ordinance did not authorize the seizure and, thus, that the seizure was unreasonable. (*Id.*) The Melvindale Defendants counter that the trailer was on public property because Armstrong conducted his business out of the building.

Even if the seizure of the trailer were somehow unreasonable under the 4th Amendment, reasonably well-trained officers in the Melvindale Defendants' position would have believed that the premises were open to the public based upon the Computer Time sign at the premises. Thus, the Melvindale Defendants are entitled to qualified immunity on Plaintiffs' § 1983 claims alleging that the seizure of the trailer was unreasonable under the 4th Amendment.[11]

---

[11]Plaintiffs assert that, even if the parking lot constituted public property, it would have been much more reasonable for the Melvindale Defendants to follow the abandoned-vehicle ordinance because it applies to both public and private property and because there was no immediate threat to public safety or interference with traffic. (Resp. at 21-22.)

Section 2.5a(1) of the Melvindale City Code defines "abandoned vehicle" as a vehicle that "has remained on public property or private property for a period of 48 hours after a police agency . . . affixed a written notice to the vehicle." Section 2.5a(2) requires police, when they believe that a vehicle has been abandoned, to determine if the vehicle was reported stolen and to affix a written warning notice to the vehicle. Section 2.5a(4)(a) permits the police to take the vehicle into custody if it is not removed within 48 hours but must recheck to determine if the vehicle has been reported stolen. (Pls.' Ex. 22; Resp. at 22.)

Armstrong asserts that he never received notice of the City's intent to impound the trailer, and that the Due Process Clause entitled him to such notice. (Resp. at 21-22.) "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Matthews v. Eldridge,* 424 U.S. 319, 332 (1976). To determine the amount of due process that is required, a court must weigh the following three factors: 1) the nature and weight of the private interest at stake; 2) the risk of an erroneous deprivation of that private interest due to the procedures used, and the possible value of additional safeguards; and 3) the governmental interests. *Id.* at 335.

"[T]he uninterrupted use of one's vehicle is a significant and substantial private interest." *Harris v. County of Calhoun,* 127 F. Supp. 2d 871, 876 (W.D. Mich. 2001); *see Stypmann v. City & County of San Francisco*, 557 F.2d 1338, 1342 (9th Cir. 1977) (holding that ownership of and continued access to an automobile is a property interest that the Due Process Clause protects). . "Yet, this private interest does not come without a price, and that price is the legitimate need for the government to regulate who uses the roads and how they are used in order to promote public safety." *Harris,* 127 F. Supp. 2d at 876. "[T]here is no constitutional requirement that [a] [p]laintiff receive notice and a hearing prior to having his vehicle impounded for failure to have it properly registered." *Id.* (recognizing that, otherwise, the car would be driven away).

While Plaintiffs cursorily contend that the trailer was sold at auction without notice to Armstrong (Resp. at 3; Ex. 8.), they have not presented any evidence to challenge that the

---

Yet, Plaintiffs have offered no support for their contention that the 4th Amendment required the Melvindale Defendants to take the most reasonable of two reasonable steps.

Melvindale Defendants published notice of the sale of the trailer in a local newspaper. (Kropik Aff. at ¶¶ 9-11; Defs.' Br. at 13.)  Plaintiffs contend, however, that the individual Melvindale Defendants deprived Armstrong of due process by failing to take additional steps to identify him as the trailer's owner before auctioning it. (Resp. at 23.)  Plaintiffs argue that, while the Melvindale Defendants maintain that they were unable to inform Armstrong of the impoundment of his trailer because it was unregistered, Armstrong filed a police report a few days after the trailer's impoundment; Armstrong's phone number was spray-painted on the side of the trailer; and Armstrong continued to reside at the premises from which the trailer was towed. (*Id.*; Pls.' Ex. 8.)  According to Plaintiffs, the Melvindale Defendants' contention that they could not locate the trailer's owner is "incredible."  (Resp. at 23.)

The Melvindale Defendants assert that, although Armstrong reported the trailer stolen to a Melvindale officer who was not involved in its impoundment a few days after that impoundment, the Melvindale police had no way to associate that report with the impounded trailer because Armstrong did not provide any ownership information by which to identify the trailer. (Reply at 5.)  The Melvindale Defendants further underscore that, although Armstrong recognized and photographed the trailer while it was in the impound yard and before its sale, Armstrong never advised the Melvindale police that the trailer that he had reported stolen was in that yard.  (*Id.*)  According to the Melvindale Defendants, had Armstrong advised them that the trailer belonged to him before its sale, they would have quickly released the seemingly-abandoned trailer to him.  (*Id.*)  That Plaintiff took pictures of the trailer in the Melvindale impound lot, knew it was there, but never went to the City to request it back undercuts any constitutional or statutory civil rights claim of Plaintiff with regard to the Melvindale

25

Defendants' actions regarding the trailer.

Even when viewing the evidence in their favor, Plaintiffs, as a matter of law, have failed to demonstrate that the individual Melvindale Defendants' sale of Armstrong's trailer violated the Due Process Clause where the trailer was unlicensed, unregistered, Armstrong's police report failed to provide information by which the trailer could be identified, and Armstrong failed to inform the Melvindale police that the trailer that he reported stolen was in the impound lot. Although additional steps to identify the trailer's owner could have been taken, such as calling the phone number on the trailer, the failure to do cannot, as a matter of law, rise to the level of a constitutional violation in these circumstances. Thus, the individual Melvindale Defendants are entitled to summary judgment on Plaintiffs' § 1983 due-process claims based upon the impoundment and auction of the trailer.

Plaintiffs assert that the September 26, 1999, impoundment and the December, 1999, auction of Armstrong's trailer were in retaliation for Armstrong's exercise of his 1st Amendment right to petition for a redress of grievances–i.e. Armstrong's state-court lawsuit for the return of the seized property, with which the City was served on August 27, 1999. (Resp. at 24.) In support, Plaintiffs argue that, although Rick Cadez regularly patrolled the City in search of the accumulation of abandoned vehicles, and although the trailer had been in the premises' parking lot for over a year, including during the time of the execution of the Melvindale warrant, Cadez only directed the impoundment of Armstrong's trailer after the filing of the seized-property lawsuit. (*Id.*) Plaintiffs further contend that, because the City's police department is small and because Rick and Dan Cadez are brothers, one could reasonably infer that the Melvindale Defendants who impounded and/or auctioned Armstrong's trailer, especially Rick Cadez, did so

26

to retaliate against Armstrong. (*Id.* at 24-25.)

Plaintiffs also argue that the impoundment and auction of Armstrong's trailer denied Armstrong the equal protection of the law in violation of the 14th Amendment. (*Id.* at 24.) Specifically, Plaintiffs contend that the impoundment and auction of Armstrong's trailer was to harass and/or to retaliate against Armstrong for the filing of the seized-property lawsuit. (*Id.*) Plaintiffs further maintain that, if Armstrong, via the impoundment and auction of his trailer, were "intentionally singled out and treated differently than other similarly-situated vehicle owners, without any rational basis," then the Melvindale Defendants violated Armstrong's equal-protection rights. (*Id.* at 25.)

Yet, Plaintiffs have failed to come forward with any evidence that Plaintiff was treated differently than other similarly-situated vehicle owners. Consequently, Plaintiff have failed, as a matter of law, to demonstrate a retaliatory motive on behalf of the Melvindale Defendants. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (holding that "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals," may establish a retaliatory motive, but recognizing that "bare allegations of malice" will not suffice). Plaintiffs have also failed, as a matter of law, to demonstrate that the Melvindale Defendants denied Armstrong the equal protection of the law. Thus, the Melvindale Defendants are entitled to summary judgment on Plaintiffs' § 1983 equal-protection and retaliation claims.

### B. State-Law Conversion Claims

Count III alleges claims of conversion under Michigan law. (*Id.* at 69-72.)

### 1. Governmental Immunity

The City asserts that it is entitled to governmental immunity on Plaintiffs' state-law

27

claims.  (Defs.' Br. at 6.)  Michigan's Governmental Immunity Act, M.C.L. 691.1407, provides, in part:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function . . . .

"Governmental function" denotes "an activity which is expressly or impliedly mandated or authorized by constitution, statute or other law."  *Ross v. Consumers Power Co.,* 420 Mich. 567; 363 N.W.2d 641 (1984); *see* M.C.L. 691.1401(f); M.S.A. 3.996(101)(f).  Whether a governmental agency was engaged in a "governmental function" depends upon the general activity in which the agency was engaging at the time of the alleged tort, rather than the specific tortious activity in which the agency was allegedly engaging.  *Smith v. Dept. of Public Health*, 428 Mich. 540, 604 n.17, 608; 410 N.W. 2d 749 (Mich. 1987).

Enunciating the standard for applying the vicarious-liability doctrine to a government agency, the Michigan Supreme Court held:

> A government agency can be held vicariously liable only when its officer, employee or agent[,] acting during the course of employment and within the scope of authority, commits a tort while engaged in an activity which is non-governmental or proprietary, or which falls within a statutory exception . . . . However, if the activity in which the tort feasor was engaged at the time [that] the tort was committed constituted the exercise or discharge of a governmental function, . . . the agency is immune pursuant to . . . the Governmental Immunity Act.

*Ross*, 420 Mich. at 625.  According to the Michigan Court of Appeals, a governmental agency cannot be held vicariously liable for the intentional torts of its employees.  *Payton v. City of Detroit*, 211 Mich. App. 375, 393 (1995).

The City contends that, at the time of the alleged torts, it was a governmental agency engaging in the exercise of operating a municipal police force, a governmental function.  (Defs.'

28

Br. at 6.) The City further argues that, to the extent that Plaintiffs' tort claims against the City

turn upon the City's vicarious liability for the alleged tortious acts of its officers, those claims

fail as a matter of law. (*Id.* at 7.) According to the City, the individual Melvindale Defendants

either were engaged in governmental functions or were committing intentional torts such that, in

either case, the City could not be liable for their actions. (*Id.*)

Plaintiffs fail to challenge, in their response, the assertion that the City is entitled to

governmental immunity on Plaintiffs' tort claims.[12] Thus, the Court GRANTS, as unopposed,

Defendants' summary-judgment motion as to Plaintiffs' state-law tort claims against the City.

The Melvindale Defendants maintain that Chief Difatta, as the highest ranking official

within the City's police department, is entitled to governmental immunity on Plaintiffs' tort

claims against him. (Defs.' Br. at 9.) M.C.L. 691.1407(5) provides that "the elective or highest

appointive executive official of all levels of government . . . [is] immune from tort liability for

injuries to person or damages to property if he or she is acting within the scope of his or her . . .

executive authority." The Melvindale Defendants assert that Difatta is entitled to governmental

immunity from Plaintiffs' intentional-tort claims. (Defs.' Br. at 9.)

Plaintiffs argue that Difatta was not acting within the scope of his executive authority but

rather, was acting as an ordinary police officer. (Resp. at 27.) Plaintiffs underscore that Difatta

has offered no evidence to demonstrate that his decision about which property of Plaintiffs to

seize/forfeit under Michigan's forfeiture statute, M.C.L. 333.7522, fell within the scope of his

---

[12]Rather, Plaintiffs simply contend that, because Michigan's governmental-immunity statute does not shield governmental employees' intentional torts, the individual Melvindale Defendants are not entitled to governmental immunity on Plaintiffs' intentional-tort claims against them. (Resp. at 26.)

executive authority.  (*Id.*)  *Cf. Walkowski v. Macomb County Sheriff,* 64 Mich. App. 460 (1975) (holding that the director of the Michigan State Police was entitled to governmental immunity for the director's administration of information contained in the police LEIN system). Defendants, in reply, failed to respond to this challenge.  The Court finds that Defendants have failed to demonstrate that Difatta is entitled to governmental immunity on Plaintiffs' state-law tort claims against him.

## 2.  Conversion

Plaintiffs assert that the individual Melvindale Defendants' damage to, failure to return, and use of the seized property constitutes conversion under Michigan law.  (1st Am. Compl. at ¶ 72.)  Under Michigan common law, "[a] conversion is a distinct act of dominion wrongfully exerted over another's personal property."  *Rohe v. Scientific Corp. v. Nat'l Bank of Detroit,* 133 Mich. App. 462 (1984).

The Melvindale Defendants underscore that, pursuant to the state-court order, they returned all of the property that they had seized for forfeiture.  (Defs.' Br. at 15.)  According to the Melvindale Defendants, Plaintiffs' counsel, in the presence of Plaintiffs, Dan Cadez, and Kropik, initialed every item on the inventory of seized property as having been returned, and Plaintiffs, up until the filing of the instant lawsuit, never complained that any of the seized property was damaged or had not been returned.  (*Id.*; Reply at 4.)

Viewing the evidence in the light most favorable to Plaintiffs, however, there are genuine issues of material fact regarding whether the individual Melvindale Defendants unlawfully converted some of the property that they had seized from Plaintiffs for forfeiture. Thus, the Court concludes that the individual Melvindale Defendants are not entitled to summary judgment on

Plaintiffs' conversion claims surrounding the damage to, failure to return, and use of the seized property.

Plaintiffs also contend that the individual Melvindale Defendants' impoundment and sale of Armstrong's trailer and its contents constitute conversion.  (Resp. at 26.)  Yet, the Melvindale Defendants did not lack the requisite legal authority to impound and sell the trailer so as to commit conversion in violation of Michigan law.  Thus, the Court concludes that the individual Melvindale Defendants are entitled to summary judgment on Plaintiffs' conversion claims surrounding the impoundment and sale of the trailer.

### IV.  SUMMARY

For the preceding reasons, the Court GRANTS the instant summary-judgment motion as to all of Plaintiffs' claims against all of the Melvindale Defendants except for Plaintiffs' § 1983 and conversion claims against the individual Melvindale Defendants limited to the claim of the alleged damage to, use of, and failure to return the seized property, as set forth in Counts I and III, respectively.  As to these excluded claims, the Court DENIES the motion for summary judgment.


SO ORDERED.

         s/ Paul D. Borman

         PAUL D. BORMAN
         UNITED STATES DISTRICT JUDGE


Dated: 5/13/05
Detroit, Michigan

cc:  Hugh M. Davis, Jr., Michael M. Wachsberg, Randall A. Pentiuk, Michael E. Rosati